CASE 16.—ACTIONS BY THE COMMONWEALTH AGAINST
THE MUTUAL BENEFIT LIFE INSURANCE COM-
PANY, THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY AND THE CONNECTICUT
MUTUAL LIFE INSURANCE COMPANY FOR TAXES
ON PREMIUMS RECEIVED ON BUSINESS IN THIS
STATE.—February 18.

# Mutual Benefit Life Ins. Co. v. Commonwealth
# Northwestern Mutual Life Ins. Co. v. Same
# Connecticut Mutual Life Ins. Co. v. Same

Appeal from Franklin Circuit Court.

R. L. STOUT, Circuit Judge.

Judgment for plaintiff, defendants appeal—Re-
versed.

Taxation—Insurance Companies—Liability on Premiums Not Col-
lected—"Received in Cash or Otherwise."—Ky. St. 1903,
section 4226, provides that every life insurance company,
other than fraternal assessment life insurance companies, not
organized under the laws of the State, but doing business
therein, shall annually return to the Auditor of Public
Accounts, for deposit in the insurance department, a state-
ment under oath of all premiums receipted for on the face
of the policy for original insurance, and all renewal pre-
miums received in cash or otherwise on business done in the
State during the year, and shall at the same time pay into
the State treasury a tax of $2 upon each $100 of said pre-
miums as ascertained. Held, that where an insurance com-
pany in its policy stipulated for a premium larger than was
actually needed to carry the risks insured against under
ordinary conditions, but which might be needed in case of
extraordinary conditions, and, in order to provide in advance
against such a contingency, collected as premium for the
first year the full amount stipulated for, setting aside so much
thereof as was overpayment as a guarantee against mis-

fortune, and then for the premiums for the succeeding years did not collect the entire amount stipulated for because of the sufficiency of the overpayment of the first year's premium to guard against additional risks, but designated the part not collected from the policy holder as a dividend, the company was not liable to taxation on the entire premiums stipulated for in the policy, but only for the amount actually collected, as the part of such premiums designated by the company as a dividend was not in fact a dividend, but merely an overcharge, which was never collected from the policy holder; and hence was not received by the company as "cash or otherwise" within the terms of the statute.

D. W. LINDSAY, W. O. HARRIS, HUMPHREY & HUMPHREY, TYLER BARNETT and WM. CROMWELL for appellants.

N. B. HAYS, Attorney General and C. H. MORRIS for Appellee.

OPINION OF THE COURT BY JUDGE BARKER—Reversing.

These three cases involve precisely the same questions, and were heard together. In deciding them we shall use, for the purpose of illustrating the principles of law involved, the data furnished by the record in Mutual Benefit Life Insurance Co. v. Commonwealth of Kentucky, etc. In this action the appellee charges the appellant with having received, and with failing to report for taxation, in each of the years, respectively, ending June 30, 1900, to June 30, 1904, inclusive, certain sums of money as premiums on business done in this State. It is not claimed that it failed to make a regular report for each of the years of premiums received; but the contention on the part of the appellee is that such reports did not embrace all of the premiums received by appellant, but, on the contrary, omitted premiums to the extent of the amounts alleged in the petition for the years respectively mentioned.

The following table will show the dates of the reports for each year ending June 30th, the amount of the premiums reported for each year as received is this State or out of this State on business done in this State, the amounts of such premiums appellee claims should have been reported, the alleged deficits in the reports, and the tax claimed by appellee to be due on such deficit:

| Date of Report | Amt. Premiums Reported. | Amt. Premiums Claimed. | Alleged Deficit. | Tax Claimed. |
|---|---|---|---|---|
| July 1, 1900 | $497,587 25 | $563,582 03 | $65,994 78 | $1,319 89 |
| July 1, 1901 | 545,024 89 | 607,440 89 | 62,416 00 | 1,248 32 |
| July 1, 1902 | 561,681 78 | 626,397 74 | 64,715 96 | 1,294 32 |
| July 1, 1903 | 578,399 48 | 642,093 00 | 63,693 52 | 1,273 87 |
| July 1, 1904 | 601,962 28 | 666,802 53 | 64,840 25 | 1,296 80 |

It is clearly shown by the evidence, and conceded by counsel for the State, that the reports as made by the appellant company embrace all first, or original, premiums—the premiums receipted for on the face of the policies—and also the subsequent, or renewal, premiums, except to the extent that such renewal premiums were reduced by what is termed "dividends." It is the contention of the appellee that such renewal premiums should have been reported without such reduction or abatement, as having been received by the company "in cash or otherwise;" while the appellant company contends that the reduction from the nominal, or stated, premium, as made, was a contract right of the policy holder, and constituted no premium or part of premium received

by the company "in cash or otherwise." And these opposing contentions present the question in this case. The case turns upon what shall be the construction given to section 4226 of the present Kentucky Statutes (Ky. St. 1903), which is the revenue law of 1902 as carried into these statutes. This section (4226) in our present Statutes is a revision of section 4227 of the Kentucky Statutes prior to the revenue law of 1902. Section 4227 of the Kentucky Statutes prior to 1902 (Ky. St. 1899) reads as follows: "Every life insurance company, other than assessment life insurance companies, not organized under the laws of this State, but doing business therein, shall, on the first day of July in each year, or within thirty days thereafter, return to the Auditor of Public Accounts, for deposit in the insurance department, a statement, under oath, of all premiums received in cash or otherwise in this State, or out of the State, on business done in this State during the year ending the 30th day of June last preceding, or since the last returns were made, and shall, at the same time, pay into the State treasury a tax of two dollars upon each one hundred dollars of said premiums as ascertained, and upon payment, file a statement thereof with the Secretary of State." The present section (4226) reads as follows: "Every life insurance company, other than fraternal assessment life insurance companies, not organized under the laws of this State, but doing business therein, shall, on the first day of July in each year, or within thirty days thereafter, return to the Auditor of Public Accounts, for deposit in the insurance department, a statement under oath of all premiums receipted for on the face of the policy for original insurance, and all renewal premiums received in cash or otherwise

in this State, or out of this State, on business done in this State during the year ending the 30th day of June last preceding, or since the last returns were made, and shall at the same time pay into the State treasury a tax of two dollars upon each one hundred dollars of said premiums as ascertained.'' The language of section 4227 is: ''* * * * All premiums received in cash or otherwise in this State or out of the State, on business done in this State during the year ending the 30th day of June last preceding. * * *''. The present statute reads: ''* * * All premiums receipted for on the face of the policy for original insurance and all renewal premiums received in cash or otherwise in this State or out of this State on business done in this State during the year ending the 30th of June last preceding. * * *'' This difference will be observed: The original statute was: ''All premiums received in cash or otherwise in this State.'' The present statute is: ''All premiums receipted for on the face of the policy for original insurance, and all renewal premiums received in cash or otherwise in this State.'' The significance of this change is apparent when we come to consider the facts. A policy of insurance stipulates for a certain annual premium. It acknowledges the receipt of the first annual premium. This first annual premium may or may not be received in full by the insurance company, but, under our present statute, it matters not whether the original premium is or is not paid in full by the policy holder. The present statute requires a tax on premiums receipted for on the face of the policy for original insurance. The old statute simply provided for all premiums received in cash or otherwise, making no distinction between first premium and subsequent premiums. The present stat-

ute does make a distinction requiring the tax to be paid upon the full premium receipted for on the face of the policy for original insurance without regard to whether it was paid in cash or otherwise, or not paid at all. The present statute provides, however, in regard to the other premiums as follows: "All renewal premiums received in cash or otherwise in this State." The appellant, every year before a premium falls due, determines how much of the stipulated premium it will exact from the insured. The diminution, whether it be called a "dividend" or a "surplus," goes in abatement of the renewal premium, and the insured pays only the difference. The insurance company, therefore, receives not the full renewal premium, but the difference between the stipulated premium and this dividend or portion of surplus. All that the insurance company receives in cash or otherwise is this difference. The old statute taxed the insurance company upon the amount which it received in cash or otherwise on the original premium, as well as upon what the insurance company received in cash or otherwise upon subsequent premiums. The present statute taxes the insurance company upon the full amount of the original premium, without regard to whether the insurance company receives it or not; but, in reference to renewal premiums, taxes the company simply upon the amount it receives of these renewal premiums in cash or otherwise. It is obvious that the word "otherwise" means payment by note or payment in some manner other than cash.

The Commonwealth is claiming to tax the appellant upon money which it never received at all. The appellant says that it is only required to pay upon money which it receives in cash or otherwise, except

that it admits that it is bound to pay the full tax on the original premium receipted for on the face of the policy, without regard to whether it in fact received such premium or not. The answer sets out the course of business of the appellant, and shows what money it has received and what money it has not received, and shows that the difference between it and the Commonwealth is that the Commonwealth is attempting to charge it with the full amount of premiums stipulated for in the face of the policy, although it does not exact and has not the right to exact such full amount, being required to give to the policy holder the advantage of the dividend or surplus, or whatever it may be called, in diminution of the nominal premium. We will now examine some of the adjudications of other courts on similar or analogous questions.

The case of German Insurance Co. v. Van Cleave, 191 Ill. 410, 61 N. E. 94, involved the question whether premiums rebated to the insured upon the cancellation of the policies should be included in the words "gross amount of premiums received," as used in a taxing statute. The court said: "In the construction of the act effect is to be given to the intention of the Legislature, and that intention appears to be to levy a tax on the gross income of foreign fire insurance companies. The object is to require such companies to pay, at designated times, a tax of 2 per cent. on the gross receipts of their business for the previous calendar year. * * * According to the argument which would include premiums returned on canceled policies, if an insurance company should issue a policy and receive a premium, and at once cancel the policy and return the premium, it would have done the amount of business represented by the

policy, and the amount received would be a premium for insurance business done. We do not think the language used will bear that construction. The merchant would not think of including in the gross receipts of his business any sales of goods with the privilege of return on the part of the purchaser, where they are, in fact, returned. In such a case there is in the end no sale and no business done in any proper sense.  * * *  The apparent purpose of the act is to levy a tax on gross income, and not upon money which is in no sense revenue to the insurance company." In People v. Miller, 177 N. Y. 515, 70 N. E. 10, it was held: "Premiums unearned by a domestic insurance company and paid in advance, but refunded upon cancellation of policies, should not be included in the 'gross amount of premiums received' for business done in this State for the purpose of taxation, and this notwithstanding the statute dec's ares the term 'gross premiums' shall include, in adf'ition to all other premiums, such premiums as are collected from policies subsequently canceled and from reinsurance, since no 'business is done' after the cancellation of a policy." In State v. Hibernia Insurance Co., 38 La. Ann. 465, the statute provided for an insurance license "based on the gross amount of premium, provided the gross amount of annual premiums shall not include unearned or returned premiums and reinsurances." The insurance companies deducted as "unearned and returned premiums and reinsurance" the rebate allowed to insurers. It does not appear clearly in the opinion what this rebate was. The State contended that rebates were not to be deducted. The court said: "But we think it very clear that, in using the term 'gross amount of premiums,' the law refers to premiums

actually received or earned; and as, by the terms of
their contracts, the companies allowing such rebates
only receive the difference between the premium
stipulated and rebate, it seems clear that such dif-
ference only constitutes the gross premiums earned.
The contracts are made with the full knowledge and
understanding that such rebates are to be allowed.
and it is a mistake for the State to say that they
are mere voluntary returns by the company." Met-
ropolitan Life Insurance Co. v. Darenkamp, 66 S. W.
1125, 23 Ky. Law Rep. 2249, grew out of an ordi-
nance of the city of Covington requiring insurance
companies to pay   one and one-half per cent. on
premuiums "received on business done in the city of
Covington from a named date to another named
date." The court held that this meant premiums on
new policies issued between those dates; as other-
wise no meaning would be attached to the words "on
business done." The court said: "There is no clearer
or more reasonable rule of construction than that
every clause or word of an ordinance should be pre-
sumed to have been intended to have some force and
effect. And 'ordinances levying taxes and imposing
duties on citizens are to be construed most strongly
against the government and in favor of the citizen,
and their provisions are not to be extended by impli-
cation beyond the clear import of the language used,
or to enlarge their operation so as to embrace mat-
ters not specifically pointed out although standing
upon a close analogy' (Sutherland on Statutory Con-
struction, section 361; United States v. Wigglesworth,
2 Story, 369, Fed. Cas. No. 16,690) ; and 'statutes reg-
ulating trade and the conduct of merchants ought to
be perfectly clear and intelligible to persons of their
description' (Dwarris on Statutes, 742)."

The case of Commonwealth v. Penn Mutual Life Insurance Co., decided by the appellate branch of the court of common pleas of Pennsylvania, and reported in 1 Dauphin Co. Rep. 233, involved the precise question we have here. In their opinion the question for adjudication is stated as follows: "This case was, by consent of the parties, tried by the court without a jury. It is an appeal by the defendant from the settlement of an account by the Auditor General, approved by the State Treasurer, for a tax on net earnings or income for the years 1873 to 1877, inclusive, with interest and penalties for failure to report and pay. From the evidence we obtain the following finding of facts: (1) The defendant is a mutual life insurance company incorporated by an act of assembly of the state of Pennsylvania, approved February 24, 1847 (P. L. 159), and several supplements thereto, only one of which, approved March 11, 1870 (P. L. 348), need be specifically mentioned. (2) During the years for which this tax is claimed, and for many years previous, the business of the defendant was that of mutual life insurance on the level premium plan. Each policy issued stipulated for the payment of an annual premium graduated for a given amount of risk, according to the age of the insured at the date of the policy. The rate of premium was fixed at a figure higher than that which experience had shown to be sufficient to meet the risk. The insured could not be called upon to pay more than the rate so fixed. He might not be called upon to pay so much. In fact, he never was called upon after the first year to pay it at all, but an abatement was made at the beginning of each year, the amount of which depended upon the calculations of the actuary applied to the treasurer's state-

ment of the business of the preceding year; and, in
making this statement, the treasurer always included
in his figures, as though it had been received by the
company, the amount of this abatement, which had
been made from the premiums of the preceding year,
and which had not actually been received by the com-
pany. The amount of the abatement, thus ascertained
by the calculations of the actuary, applicable to the
premiums of each policy holder, was then deducted
from the amount of the premium stipulated for in the
policy, and the balance only was collected and received
by the company. These abatements are called on
the books of the company, and in its annual state-
ments and its reports to the insurance commissioner
'dividends to policy holders' or 'surplus to policy
holders.' But they are, in fact, just what we have
stated above." And then, among other things, it is
said: "But we think the so-called 'dividends to policy
holders' are not 'net earnings or income,' and do not
represent such earnings; and that defendant is not
liable to tax in respect to them. Notwithstanding
the mass of testimony and exhibits on this point, in-
cluding the ingenious questions of the able counsel
on either side, followed by answers from the officers
of the company, called as witnesses, not always as
clear or intelligent as might have been expected, the
facts are few and simple, as we have found them
above. It is strenuously contended by the able special
counsel for the Commonwealth that because these
abatements are entered on the books of the company
as 'dividends to policy holders' or 'surplus to policy
holders,' they, therefore, represent net earnings or
income, and furnish a measure of the liability of the
company to taxation. Whatever these statements
may be called, they are in reality what we have

stated in the finding of facts.  The amounts they rep-
resent are mere negative quantities, abstract state-
ments not of what is, or is to be received or to 'come
in,' but of what is not to be received.  The calcula-
tions are made for the express purpose of determin-
ing how much of the amount which the company might
receive shall not be received, and one of the items
which make up the apparent amount, upon the basis of
which this calculation is made, is the sum which was
abated and not received during the preceding year.
In short, the whole proceeding is merely a method
by which the books of the company are made to show
what would be the actual gross debtor and creditor
account of the company, if the whole amount of the
premiums was collected and a part was afterwards
returned to the policy holders, while, in fact, it is
neither collected nor returned.  The reason for fixing
the premium stipulated for at a higher rate than
sufficient under ordinary circumstances to cover the
risk is, of course, that the company may be strong
enough to stand in case of extraordinary mortality
among its members.  It is a fallacy to suppose that
the real nature of the transaction is that the policy
holder pays his whole stipulated premium, and re-
ceives his share of the dividend or distribution of
surplus.  The relation between him and the company
is not that suggested to one of the witnesses by the
counsel for the Commonwealth.  This witness was
both a salaried officer of the company and a policy
holder, and he was asked by counsel: 'If you owe
$130 annual premium and the company pay you the
amount of your salary less this sum, and give you
a receipt for this, is it not the same to you as if it
pay your salary in full and you pay the $130?'  The
answer must be, of course: 'It is.'  But it is the same

only because he happens to unite two characters in the same person—officer and policy holder. The transaction is really and essentially double. The officer gets his whole salary, and the policy holder pays his premium. And, if the salary were subject to an income tax, honesty would require that it be all returned for taxation, and not the amount, less the premium paid. The mutual debts are of a different nature one from the other, and, if on suit for one the other was set up in defense, it must be as a set-off. But, if the policy holder were sued for his annual premium, and used the dividends as a defense pro tanto, it would be by way of recoupment simply; not as independent claim to balance in part the claim against him, but part of the data to show the amount which he really owed. This shows that the transaction here is essentially simple.''

The difficulty which surrounds the appellant in this case grows out of its method of bookkeeping, and its use of terms out of their ordinary signification. What really happened in every case was that the stipulated premium was much larger than the company actually needed to carry the risk under ordinary conditions; but, if extraordinary conditions should arise, the whole might be needed. Thus, if an epidemic swept over the country, the losses among its policy holders would, perhaps, be abnormal, and then the company would need the full amount of the contract premium. Now, in order to prepare in advance against such untoward contingencies of the future, the company collected the first year the full amount of the premium and set aside so much of it as was overpayment as a guaranty against misfortune; and then said to its policy holders: ''You need not pay hereafter the full amount of the stipulated premium, but may omit the

overplus, because we have already collected from
you more than you should have paid under ordinary
circumstances, and we are holding that as protection
against extraordinary losses. This overplus thus
far is still on hand, and, as long as it remains, you will
not have to pay the full amount of the premium.''
The company, on its books, call this a 'dividend,''
and pretends to credit the annual premium with it.
Now, the truth is that this overpayment is not a divi-
dend in any sense of the term; nor is the failure of
the company to collect the full amount of the pre-
mium in after years a credit in any sense of the term.
A sum of money applied as a credit can never be
used for the same purpose again. If I owe A $50,
and he owes me five notes of $150 each, when I credit
him on the first note with the $50 I owe him, he
cannot require me to credit that same sum on the
remaining four notes as they fall due. But that is
just what the State is insisting on being done in this
case. The policy holder makes the overpayment of
premium technically called "loading," and the com-
pany holds this sum and calls it a "dividend," and
the State says that this is a crediting of this same
sum on each of the after accruing premiums, and
should be considered as so much collected each year
by the company and as having been paid "otherwise"
than as cash. In order to bring this matter before
our minds distinctly, let us assume that in 1900 A.
takes out a policy in the appellant company in which
the stipulated premium is $150 per annum, that of
this sum $100 would be sufficient to carry the risk in
ordinary times, and that $50 is what is called "load-
ing" collected in order to meet the contingencies of
the future. Now, in 1900 the policy holder pays the
full amount of the premium—$150. After that, the

company says to him: "You need only pay $100 per annum; and, as long as the $50 of overpayment you made in 1900 remains unexhausted, your annual premium will be really $100, instead of $150 as stated in the policy." The account in five years would be stated as follows:

| | |
|---|---|
| 1900 (beginning of the insurance period) premium paid ........................ | $150 00 |
| 1901, premium paid........................ | 100 00 |
| 1902, premium paid........................ | 100 00 |
| 1903, premium paid........................ | 100 00 |
| 1904, premium paid........................ | 100 00 |
| 1905, premium paid........................ | 100 00 |
| Total ........................ | $650 00 |

Obviously the total amount of money paid by the policy holder and received by the insurance company is $650, and it has received no more ,either in cash or otherwise; and on the sum so received it is conceded that appellant has paid the tax due. Now, to tax the company on the $50 per year, which it did not collect, but left in the pockets of its policy holders, is to tax it on money that it never received, either in cash or in any other manner. To consider the overpayment of $50, made at the beginning of the contract period, as money belonging to the policy holder, and a credit to be made each year on the annual premium, is to make the same sum of $50 pay in credits a debt equal to itself each year during the life of the policy. If the policy continued for 20 years, then one sum of $50 would pay off and extinguish $1,000 of debt due for premium; i. e., each year it would be credited on the contract premium of $150 and reduce

it to $100.   So that, as said before, one sum could be credited on annually accruing debts ad infinitum.

If we look only at the method of bookkeeping of the appellant and have regard only to the terms it uses, there is much in the appearance of the case thus presented to warrant the position of the Commonwealth as to its right to tax the so-called "dividends" said to be annually credited on the premiums due from policy holders, but the law looks below the mere appearance of things, and has regard to the reality; and, thus looking, it sees that the appellant misuses the terms "dividend" and "credit," and, as shown above, pays no dividend and allows no credit, but that, in reality, all that it does is to collect on the first premium a sum sufficient to meet the contingencies of any given year of the future, and then abstains from collecting any further overpayments while the first remains on hand.   If it were permissible to extend our investigation from the law of the case into the realm of economic policy, much might be said in favor of encouraging these so-called "annual dividend-paying" companies, who manage their affairs economically, and leave in the pockets of the people these misnamed "dividends" rather than, as is done by the deferred dividend companies, collect unnecessary premiums and hold them for long periods of time; thus piling up gigantic sums of money in our financial centers with which, it is charged, politicians are corrupted, speculation is engendered, and the fair prospect of legitimate commerce is one day paralyzed by the unnatural stringency of the money market, and on another maddened with the intoxication of an equally unnatural inflation of capital, all in the interest of the speculators and brokers, and detrimental to that of the people at large.   But with

this phase of the question we have nothing to do. Our duty is wholly performed by construing the statute so as to require the corporation to pay taxes on every dollar it actually receives either in "cash or otherwise," but not extending its terms so as to make it pay on what it does not receive, but leaves in the pockets of its policy holders.

For these reasons, the judgments are reversed, with directions to dismiss the petitions.

O'REAR, C. J., and NUNN, J., dissenting.

Petition for rehearing by appellee overruled.